*92 The following case was made for the opinion of the Court; and it was agreed that the judgment should be entered by nonsuit or default, according as that opinion should be in favor of the plaintiff or defendant.
Dec. 18, 1793, Israel Morey, father of the plaintiff, was the owner of the ferry mentioned in plaintiff’s declaration (by purchase from W. Simpson, original grantee under John Wentworth, Governor of New Hampshire, March 3, 1775).
William Simpson, one of the proprietors of Orford Bridge, had, before Dec. 18, 1793, applied, or manifested his determination to apply, to the legislature for a grant of the privilege to build and maintain a toll-bridge across Connecticut River within the limits of Morey’s ferry-privilege.
Israel Morey, on the same Dec. 18, 1793, wrote and subscribed the following declaration, viz.: “ Whereas William Simpson, of Orford, in the County of Grafton, State of New Hampshire, hath determined, with others, to erect a bridge over the river Connecticut, opposite Orford and Fairlee ; and .as I am possessed of the exclusive right of the ferry, extending two miles each way from the landing at Orford now occupied for the ferry, I hereby certify that I have no objection, and do hereby relinquish the same, on condition that a bridge shall be erected, and as long as the same shall be supported, over the said river, within the limits thereof, and further as the lands on the west side river, where the said bridge is expected to be erected, I hereby certify that I have not any objection to the same.” (a)
Morey gave this license, or consent, with a view to his own accommodation, (b) — being desirous that a bridge should be erected in that place, and that Simpson and others should obtain an act of incorporation for the purpose, — and made and delivered him the said writing, that he might exhibit it to the legislature when he should apply for an act of incorporation. This writing was accordingly exhibited to the *93 legislature then in session; and an act passed, on Jan. 29, 1794, incorporating William Simpson and others for the purpose of building a toll-bridge at Orford, and authorizing them to erect a bridge over any part of Connecticut River opposite Orford or Piermont, and granting to the corporation the exclusive privilege of keeping and holding the same for ever. The act contained a clause that, if the corporation thereby created should fail, for the space of four years from the passing of the act, to erect and complete the bridge, then the act should be null and void ; and also a clause that nothing in the act should affect the grant or grants of any ferry or ferries in Piermont, but the act was silent as to privileges or grants of ferries in Orford.
The writing signed by Morey was annexed to the original act of the legislature, and still remains annexed thereto. The bridge was not built within the four years; and an act passed the legislature June 13, 1800, on the application of Simpson and others interested in the former grant, allowing a further time of three years for erecting the bridge. Morey gave no consent to this latter act, nor had he any notice or knowledge of the application for it. On Oct. 28, 1800, Morey conveyed the ferry to his son, the plaintiff (the consideration expressed in the deed being $1,200). Both parties (to the deed) then well knew of the last act; and the plaintiff knew of the first act, and of his father’s consent thereto, and gave his father an obligation that the said writing should not be deemed a breach of the covenants, in his deed conveying the ferry. Within the time limited in the last act the bridge was erected, and has been continued ever since, and defendants have received toll for a year next before the date of the plaintiff’s writ.
The question for the opinion of the Court was, whether the plaintiff was entitled to recover.
At this Term, Smith, C. J., after stating the substance of the case, delivered the opinion of the Court.
It cannot admit of doubt that the erection of the bridge complained of lessens the value of the ferry now owned by *94 the plaintiff. But it does not follow that he can maintain any action to recover a compensation in damages for the loss he has sustained. 1 G. Bacon, 76-78. There are many cases of loss or damage (called in our books damnum absque injurid') for which no action lies. If the defendants have 'a right by law to do what they have done, neither this action nor any other can be maintained. They claim this right by virtue of an act of the legislature, granting to them the exclusive privilege of erecting a bridge in this place. It will not be contended by the plaintiff that the legislature, or the supreme authority in the State, have not the right to grant, upon_ such terms as they may think proper, to certain individuals, the exclusive privilege of keeping ferries and of building bridges within certain limits over Connecticut River. The plaintiff claims the ferry under a grant from Governor Wentworth, March 3, 1775. This grant gives to the person under whom plaintiff claims the sole and exclusive right of keeping a ferry, and of keeping, using, and employing a ferry boat or boats, for the transporting of men, horses, goods, cattle, and carriages, &c., across Connecticut River, within certain limits. By this grant all other persons are prohibited from setting up any other ferry upon or across the river Connecticut within two miles above and two miles below the landing-place at Orford, as well as from molesting or interrupting the owner in the enjoyment of his ferry. It may safely be admitted that this grant cannot be arbitrarily infringed or repealed by the supreme power of the State. It never has been repealed. A grant of a ferry to the defendants within those limits would be void; it would be an unconstitutional act, which no Court could or would regard. Two questions arise. 1. Whether the grant to defendants of the exclusive right of erecting a bridge within the limits of the plaintiff’s grant of ferry is an infringement of the latter privilege or grant? 2. Whether it is made good by the consent of the owner of the ferry ?
It is not absolutely necessary to express an opinion on the first point. There can be no doubt but that the legislature may refuse the grant of a bridge till compensation is made *95 for the loss Avliicli will be sustained by the owner of the ferry.[1] In this act, which also authorizes, and, indeed, on certain contingencies, requires, the erection of a bridge across the river from Piermont, there is a clause declaring that nothing in the act contained shall affect the grant or grants of any ferry or ferries in Piermont.
The grant of a ferry is against common right, and must therefore be construed strictly. It excludes all other persons from keeping a ferry within the limits of that grant, and, of course, from transporting men, horses &e., across the river in ferry-boats. But it does not prohibit persons from crossing or enabling others to cross it in any other way. The building of bridges conduces greatly to the public benefit. Can it be presumed that it was intended in the grant of a ferry to prevent the erection of a bridge? 4 T. R. 794, 796; see 2 Johns. 263, Kent, C. J. A ferry and a bridge, though they serve the same end, are things totally distinct in their nature. The grant of a ferry would not infringe the grant of a bridge. The grant of a bridge lessens or destroys the value of a ferry, but it does not infringe on the privilege of keeping a ferry and transporting persons, &c., in feny-boats. It does not molest or interrupt the owner of the ferry “ in his ferry.” (a)
But, admitting that the grant to erect a bridge, and the erection of a toll-bridge, is a molestation, interruption, disturbance, or injury, for which an action lies, is the present act unconstitutional? This depends upon another question, Did the owner of the ferry consent to the passing of the act ?
It has been contended, on the part of the plaintiff, that the writing signed by Morey and annexed to the original act is not a conveyance to the State, or to the corporation created by the act, of the right of keeping a ferry. This is clear. A *96 conveyance must be by deed. It could not be to the corporation, because they had at the time no existence. It does not purport to be a conveyance, but a consent that the act should pass; that a privilege alleged to be inconsistent with one before granted to him should be granted to another, (a) Suppose, after the act had passed, I. Morey had executed this writing to the corporation; could he afterwards complain that they were guilty of a wrong in erecting a bridge ? If he could not, he shall not in this case, because he authorized the legislature to authorize the defendants to do what they have done. (b) But it is objected that Morey’s consent was not absolute, but conditional. The only condition expressed is that a bridge be erected and continued. That condition has been complied with. But it is said that this consent must be understood as limited to the four years mentioned in the first act. But why this construction ? He might have given it upon this condition expressed. The act was not passed when this writing was made.; no mention had been made of four years or any other limited period within whiph the bridge should be erected. He must be understood to mean, either that the bridge should be erected within such time as the legislature should be pleased to limit, or that it should be erected within a reasonable time. If his consent had been given after the act was passed, it would then perhaps be fair to say that his meaning was that the bridge should be erected within four years. But here he seems to have submitted it to the legislature to' impose such terms and conditions on the corporation as they should judge proper. The legislature by the first act allowed four years; they might have then allowed seven. In the second act it is declared that it is reasonable that three years more should be allowed, (c) They understood Morey’s consent to be unlimited, and therefore did not notify him of the *97 application for the second act. We understand it so, at least as submitting this to legislative discretion. The defence, therefore, is good. The defendants have done nothing- which the act does not warrant. The act is constitutional, even if it affects the rights of the owner of the ferry ; because he consented, (a) and is estopped from ever afterwards objecting. This consent was not limited to any particular time within which the bridge must be erected. It is sufficient if done in a reasonable time. It has been erected in a reasonable time, a time not unusually allowed in cases of this sort.

Plaintiff became nonsuit.

[1]

а) The latter part of this writing is unintelligible, but it is not material.

б) Conceiving, probably, that it would enhance the value of his real estate more than the loss of the profits of the ferry.

 Suppose a number of individuals build a bridge for the use of the public without toll, or that the State build such a bridge.

 And there can be no doubt that the legislature may authorize the building of a bridge, if suitable provision is made for compensating the owners of the ferry. Piscatuqua Bridge v. New Hampshire Bridge, 1834. 7 N. H. 35; Crosby v. Hanover, 1858, 38 N. H. 404; Backus v. Lebanon, 1840, 11 N. H. 19.

а) It does not seem that any particular form is requisite to be observed iu giving consent to an act of the legislature.

б) What is this but saying, “Erect a bridge; I consent,” — and then "afterwards, “ Demolish it, because it injures my ferry.”

 If the legislature could at once allow seven years, why not at twice ?

 Act cannot take away private property without consent of the owner, and without any public object or any just compensation, ut semble, 2 Johns. 263.

 According to later decisions, the question of reasonable time, when open, would be one of fact for a jury. Tyler v. Webster, 1861, 43 N. H. 147, 151; State v. Plaisted, 1861, 43 N. H. 413; Batchelder v. Batchelder, 1868, 48 N. H. 23, 24. But if Morey is regarded as having submitted the matter of time to the discretion of the legislature, there vrould be no question of the sort left open in this case.
A legislative grant of a ferry within the limits of a previously granted exclusive ferry-privilege, without the assent of the first grantee, or without making provision for his compensation, would be invalid, on the principle of the decision in The Binghamton Bridge, 1865, 3 Wall. (U. S.) 51 (unfavorably commented on by Judge Cooi.ey in The Princeton Review for March, 1878, p. 262. See also Pomeroy’s edition of Sedgwick on Stat. and Const. Law, 588, n.). And the legislature have no more right in such a case to charter a new free ferry than a now toll ferry. See Aikin v. Western R. R., 1859, 20 N. Y. 370; Long v. Beard, 1819, 3 Murph. 57; Pearson, J., in Taylor v. Wilmington & M. R. R., 1857, 4 Jones (N. C.), L. 277, 282-284; Davis, J., in The Binghamton Bridge,, ubi sup., 81, 82; Townsend, v. Blewett, 1811, 5 How. (Miss.) 503. See, however, Tucker, P., in Trent v. Cartersville Bridge Co., 1841, 11 Leigh, 521, 531, and Pearson, C. J., in Satterthwaite v. Commissioners of Beaufort County, 1877, 76 N. C. 153, 155.
But upon the principles of construction applied to such grants (Charles River Bridge v. Warren Bridge, 1837, 11 Pet. 420, 544-548), it is competent for the legislature to authorize the establishment of other methods of transportation, which will materially impair the value of the so-called “exclusive ” right of ferriage.
“The grant of an exclusive right of ferry is certainly not an exclusive right of all modes of transportation and conveyance.” An exclusive *98 privilege of maintaining a ferry within certain limits is not infringed by the erection of a bridge within those limits. Parker, J., in Piscataqua Bridge v. New Hampshire Bridge, 1834, 7 N. H. 35, 59, 60; Mellish, L. J., in Hopkins v. Great Northern R., 1877, L. R. 2 Q. B. D. 224; Piatt v. Covington & Cincinnati Bridge Co., 1871, 8 Bush (Ky.), 31; Richmond & Lexington Turnpike Co. v. Rogers, 1863, 1 Duv. (Ky.) 135. (See, however, Hitchcock, J., in Dyer v. Tuskaloosa Bridge Co., 1835, 2 Port. (Ala.) 296, 305; and Gates v. M’Daniel, 1829, 2 Stew. (Ala.) 211, where it was held that the erection of a bridge without public authority was an infringement on an exclusive ferry.)
Conversely, it has been decided, that an exclusive right of maintaining a toll-bridge is not infringed by the grant of a ferry. Parrott v. City of Lawrence, 1872, 2 Dill. 332. And see Miller, J., in Proprietors of Bridges v. Hoboken Land & Improvement Co., 1863, 1 Wall. (U. S.) 116, 149. In Norris v. Farmers' & Teamsters' Co., 1856, 6 Cal. 590, it was held that maintaining a ferry without public authority was an infringement on a regularly licensed bridge; but the case was decided under a statute provision that “ no ferry or toll-bridge ” should be established within a certain distance of a regularly established “ ferry or toll-bridge.”
Ferries and bridges are regarded as distinct modes of transportation. In an action against a ferryman for refusing passengers or talcing excessive prices, it is no excuse that he has built a bridge for passage. Com. Dig. Pischary, B. In Payne v. Partridge, 3 Wm. III., 1 Salk. 12 (s. c. nomine Pain v. Patrick, 3 Mod. 289), it is said.that the owner of a ferry cannot “ let down the ferry and put up a bridge without license and an ad quod damnum.” Compare Morton, J., in Charles River Bridge v. Warren Bridge, 1829, 7 Pick. 344, 453. Greer v. Haugabook, 1872, 47 Ga. 282, decides that a statute prohibiting a private ferry within three miles of a “public bridge” does not forbid the establishment of a private ferry within three miles of a public ferry.
The writer of the above opinion in Morey v. Proprietors of Orford Bridge was consulted, after his return to the bar, by Frederick W. Geyer, the owner of the exclusive toll-bridge privilege over the Connecticut River described in Tucker v. Cheshire R. R., 21 N. H. 29, 30. Among the questions asked were the following : Can an individual set up a ferry within the bridge limits; or any individual ferry himself over, or swim over? Can any one pass over in winter within the limits on ice?
In reply to these questions, Judge Smith wrote to Mr. Geyer, under date of Aug. 29, 1812:' — ■
“I do not think that your grant takes away from an individual the right of crossing the river in every other way except over your bridge. I am not clear that the legislature could not constitutionally grant a ferry within your limits. It would be improper to do it where it would injure the more convenient passage by bridge. The grant of a bridge does not seem to affect the grant of a ferry. The public may grant both. At any *99 rate, I see nothing to restrain individuals passing in their own private boats, swimming over, or passing on nature’s bridge, the ioe. Setting up a public ferry, that is, transporting persons across the river for hire, is a different thing, and what has not been, and will not be, attempted. I have not been able to find any decisions on questions of this sort, either in the English courts, or in those of our own country. I found my opinion on general principles only, and should have been glad if that opinion had been more agreeable to your wishes.”
Tn his manuscript notes on Mr. Geyer’s queries, Judge Smith went farther than his letter, and expressed the opinion that the legislature ‘ ‘ could not prohibit an individual from swimming over, or going over in his boat, or wading through.” Probably courts will be slow to presume that the legislature intended to impose such restrictions. See Woodwaud, J., in Weld v. Chapman, 1856, 2 Clarke (Iowa), 524, 527; Trent v. Cartersville Bridge Co., 1841, 11 Leigh, 521. But the charter of the Cayuga Bridge Co. was construed as prohibiting a person from crossing the lake on the ice in his own sleigh within three miles of the bridge. Cayuga Bridge Co. v. Stout, 1827, 7 Cow. 33 ; overruling previous statement of Savagk, C. J., in Sprague v. Birdsall, 1823, 2 Cow. 419.
An exclusive ferry-right is not infringed by the carrying of passengers and goods in another boat in the ordinary prosecution of commerce, without the regularity or purpose of ferry-trips. Swaynk, J., in Conway v. Taylor’s Executor, 1861, 1 Black (U. S.), 603, 633. But the proprietor of a mail coach, who is in the habit of transporting passengers in his coach across the river on a boat, though not receiving pay specifically for ferriage, infringes on a ferry-right. Weld v. Chapman, 1856, 2 Clarke (Iowa), 524,
Where an exclusive right of maintaining a toll-bridge within certain limits was granted prior to the introduction of railroads as a means of transportation, it has been held not an infringement to authorize the erection, within those limits, of a railroad viaduct, or bridge, to be used for railroad purposes. Proprietors of Bridges v. Hoboken Land & Improvement Co., 1863, 1 Wall. (U. S ) 116; affirming s. c. 14 N. J. Eq. (2 Beasley), 81, 503; McLeod v. Savannah, Albany, & Gulf R. R., 1858, 25 Ga. 445; McRee v. Wilmington & R. R. R., 1855, 2 Jones (N. C.), L. 186; Walworth, Ch., in Mohawk Bridge Co. v. Utica & Schenectady R., 1837, 6 Paige, Ch. 551, 565; Thompson v. N. H. & N. R. R., 1846, 3 Sandf. Ch. 625, 660. See also Gilchrist, C. J., in Tucker v. Cheshire R. R., 1850, 21 N. H. 29, 39.
Contra, Eufield Toll-Bridge Co. v. Hartford & N. H. R. R., 1845, 17 Conn. 40.
In Lake v. Virginia & Truckee R. R., 1872, 7 Rev. 294, it was decided that an exclusive toll-bridge grant, which was made long after railroads had become a common mode of transportation, was not infringed by the erection of a railroad bridge; and this, although the toll-bridge grant pro *100 vided that it should be unlawful for others to construct over the river, within the limits, “ any bridge, ferry, or other public means for the conveying across said river of either persons or property.”
But the right to maintain a railroad bridge or ferry for the transportation of railroad passengers and employees would not, as against a prior exclusive grant of toll-bridge or ferry, include the right to permit persons who were not railroad passengers or employees to pass over gratuitously. See Aikin v. Western R. R., 1859, 20 N. Y. 370.
Whether the excavation of a tunnel for passage under a river, or the establishment of a line of balloons to fly over a river, would infringe upon an exclusive ferry or bridge grant, are questions which have been suggested, but are not yet judicially determined.